IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JACK M. H. Jr.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil No. 19-cv-505-DGW[2] |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM and ORDER**

**WILKERSON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) Benefits pursuant to 42 U.S.C. § 423.

## **Procedural History**

Plaintiff applied for DIB and SSI in June 2016, alleging a disability onset date of March 1, 2012. After holding an evidentiary hearing, an ALJ denied the application on December 5, 2018. (Tr. 17-31). The Appeals Council denied plaintiff's request for review, making the ALJ's decision the final agency decision subject to judicial review. (Tr. 1). Plaintiff exhausted administrative remedies and filed a timely complaint with this Court.

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Doc. 14.

## Issues Raised by Plaintiff

Plaintiff raises the following issues:

1. The ALJ erred by discussing only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it.

2. The ALJ "played doctor" by independently interpreting medical evidence.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 404.1520.

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The plaintiff bears the burden of proof at steps 1–4. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921

(7th Cir. 2010), and cases cited therein.

## **The Decision of the ALJ**

The ALJ followed the five-step analytical framework described above. She determined that plaintiff had worked after the alleged onset date, but not at the level of substantial gainful activity. He was insured for DIB through June 30, 2016. The ALJ found that plaintiff had severe impairments of thoracic and lumbar degenerative disc disease status post thoracic kyphoplasty; history of left ankle surgeries that included replacement(s) and repair of ruptured Achilles tendon; and obesity.[4]

The ALJ found that plaintiff had the RFC to do sedentary work with restrictions. He was limited to no use of foot controls bilaterally; occasional stooping and climbing of ramps and stairs; no kneeling, crouching, crawling, or climbing ladders, ropes or scaffolds; and no exposure to extreme temperatures, humidity, wetness, vibrations, or hazards such as unprotected heights or dangerous machinery. In addition, the ALJ found that plaintiff can sit for 30-45 minutes at a time for a up to a total of 6 hours in an 8-hour workday; stand for 30-45 minutes at a time for a total of up 2 hours in an 8-hour workday; and walk for 30-45 minutes at a time for up 2 hours in an 8-hour workday.

Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do his past relevant work as an overhead crane operator, machine tender, pizza deliverer, buffet attendant, construction worker, or silo tender.

---

[4] "Kyphoplasty is a minimally invasive procedure that is performed to restore height in a damaged vertebra and stabilize the bone. . . . Kyphoplasty specifically involves creating space within the vertebra and injecting a specially formulated cement into the bone through a balloon-like device." https://spine.memorialhermann.org/kyphoplasty/, visited on January 14, 2020.

However, he was not disabled because he was able to do other jobs that exist in significant numbers in the national economy.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1. **Agency Forms**

Plaintiff was born in 1981 and was almost 31 years old on the alleged date of onset. He was 37 on the date of the ALJ's decision. (Tr. 236). He said he was disabled because of several problems including chronic lower back pain, L4-5 disc herniation, bone spurs, plantar fasciitis, and left ankle fusion. He was 6 feet tall and weighed 237 pounds. He said he stopped working on March 1, 2012, because of his condition. (Tr. 240-241).

2. **Evidentiary Hearing**

Plaintiff was represented by an attorney at the hearing in September 2018. (Tr. 39).

Plaintiff testified that he could not work because of pain in his feet and back. He had to elevate his legs because of swelling in his feet. He had difficulty sleeping because he could only lay on his right side. He had pain in his low back and down his left leg. He had pain between his shoulder blades. (Tr. 55-56). He could stand for 20 or 25 minutes and walk for 10 minutes at the most. After that, he gets "excruciating pain" in the lower back, the pain down his left leg is "intolerable," and his feet feel like they are on fire. He could sit for 30 minutes. (Tr. 58-59).

From 2015 to approximately November 2017, plaintiff did "menial jobs" for his landlord in exchange for rent. He worked about 15 to 20 hours a week. (Tr. 45-46).

Plaintiff's five-year-old son had been living with him since December 2017. From November 2016 until about June or July 2018, plaintiff lived in an attic apartment. He had to walk up one flight of stairs to get into the apartment. Plaintiff did not pay rent there. The owner of the building rented to mentally disabled people. Plaintiff checked on the other tenants to make sure they were not tearing the place up or burning it down. He got around the building on a "knee scooter." (Tr. 62-64).

Plaintiff denied doing any part-time work in 2018. (Tr. 47).

A vocational expert (VE) also testified. The VE testified that a person with plaintiff's RFC assessment could not do plaintiff's past work, and but he could do other jobs at the sedentary exertional level. (Tr. 72-74).

### 3. Relevant Medical Records

The earliest medical record is dated September 2, 2015. Plaintiff was seen at Wabash Valley Health Center to establish care with a primary care provider. He gave a history of fusion of the left ankle and partial fusion of the right ankle at age 17. He was working as a carpenter. He said he had pain and difficulty walking. He complained of pain in the upper and low back and behind the left collarbone. On exam, his gait was normal. Range of motion of the ankles was poor. The upper and lower extremities had normal range of motion and full strength. The right clavicle was larger than the left. He had no pain on overhead reaching. He

was tender over the left clavicle. There was a deep inward curvature of the thoracic spine between the shoulder blades. He was prescribed Wellbutrin and Tylenol Extra Strength. (Tr. 294-299).

X-rays of the ankles showed a fused left ankle with secondary osteoarthritis and a prominent plantar spur. The right ankle had no osteoarthritis changes and a tiny plantar spur. (Tr. 300-301). X-rays of the thoracic spine were unremarkable. (Tr. 304). X-rays of the cervical spine were normal. (Tr. 306). X-rays of the lumbar spine showed normal vertebral height without compression deformity. There was no spondylolysis. There were endplate osteophytes at L1-L2 and T1-L1. (Tr. 310).

Plaintiff returned in October 2015. Pain forced him to work only 2 days a week. They were waiting for his insurance to become active to refer him to orthopedics. He was prescribed Tramadol. (Tr. 312-314). About two weeks later, he said Tramadol helped his back pain but not his shoulder and ankle pain. He wanted something stronger. He refused a drug screen because he used marijuana. (Tr. 316-317).

Plaintiff saw a rheumatologist, Dr. Davis, for joint pain in March 2016. He was referred by Dr. Janicki.[5] He had started taking Lyrica a week earlier and already saw improvement in his pain and sleep. On exam, he had a full range of motion of the shoulders, elbows, wrists, hands, hips and knees. He had tenderness in both ankles and limited range of motion in the left ankle. His left hip clicked with internal rotation. He had mild MTP tenderness in both feet. Straight

---

[5] There are no records from Dr. Janicki in the transcript.

leg raising was normal. The diagnoses were osteoarthritis in the back and left ankle. He was started on a trial of Meloxicam and given a prescription for physical therapy. (Tr. 396-398). In April, plaintiff reported that Meloxicam "helped considerably." (Tr. 401). However, in June 2016, he reported that he was unable to tolerate Meloxicam. He was to discontinue Meloxicam and Lyrica and try Cymbalta. (Tr. 404-406). In July 2016, he said he had to stop Cymbalta because of side effects. He had to stop working because of joint pain, especially in the feet and ankles. His rheumatoid factor was negative. (Tr. 407-409).

In April 2016, plaintiff was seen at UAP Clinic Bone and Joint Center with a complaint of bilateral hip pain. The doctor reviewed his lumbar MRI and agreed that he had neuroforaminal stenosis at L4-5 and sacralization of the L5-S1 level. X-rays of the hips showed well-seated hips without fracture or dislocation. On exam, he had a full range of motion of the thoracolumbar spine with some pain at full flexion and extension. He had pain in the left calf with straight leg raising. Range of motion of the hips was full. There was a reproducible pop when going from flexion to extension and a positive FADIR maneuver on the left. The doctor diagnosed degenerative disc disease with L5 radiculopathy and anterior hip pain/popping. He recommended an evaluation for labral tear. (Tr. 335-337). No labral tear was identified. (Tr. 343).

Plaintiff was treated by a pain management specialist, Dr. Pendergast. In August 2016, the doctor noted that an MRI showed a broad-based disc bulge at L4-5 with a left annular tear and herniation encroaching on the left L5 nerve root. Dr. Pendergast administered an epidural steroid injection. (Tr. 418-419).

In September 2016, plaintiff reported to the rheumatologist that the injection did not help. (Tr. 429). In December 2016, plaintiff said he had a good response to Limbrel and Meloxicam but had some increase in myalgias and flulike symptoms. He could not work more than 10 to 15 hours per week. The rheumatologist tried him on Limbrel and low dose Meloxicam. (Tr. 427-428).

In January 2017, plaintiff saw Dr. Kleinman, a podiatrist, for his left ankle problems. He had a prior surgical fusion of the left ankle. Dr. Kleinman performed a total left ankle replacement in March 2017. Twelve days later, he was doing "extremely well." He was nonweightbearing and denied significant pain. Five weeks after surgery, he denied pain and had excellent range of motion. He was to continue range of motion exercises and could begin light to moderate weightbearing in a walking boot. Two months after surgery, he was ambulating in a walking boot with only mild pain. On exam, there was scant edema with no instability. He had pain-free motion. The Achilles tendon was intact with normal function. He could discontinue the walking boot and wear soft shoes. He was to slowly increase activity. In late May 2017, plaintiff reported that he had tripped and injured his left ankle. He suffered a complete rupture of the left Achilles tendon. Dr. Kleinman surgically repaired the left Achilles tendon on June 13, 2017. In September 2017, Dr. Kleinman noted that he was continuing to improve significantly. He was ambulating without difficulty in a walking boot and had episodic aching. He was told he could discontinue the walking boot. On November 7, 2017, plaintiff was "doing extremely well." He denied pain, was ambulating in his own shoes, and was active. Exam showed normal range of

motion of the left ankle with no crepitus or restriction. There was no swelling. Dr. Kleinman explained to plaintiff that he had healed extremely well and needed no further treatment. (Tr. 522-560).

Plaintiff saw Dr. Madsen in August 2017 for thoracic pain. Dr. Madsen diagnosed compression fractures at T10 and T11. He performed kyphoplasty at those levels in August 2017. He was seen 10 days later. He said he had constant pain with grinding and burning in his mid-back. His sutures were removed, and he was to return in the coming weeks. (Tr. 510-521). There are no further records from this doctor.

Plaintiff saw his primary care provider in February 2018, complaining of bad back pain after he fell on the stairs. Exam showed bilateral lumbar tenderness. (Tr. 669-671).

In March 2018, x-rays of the lumbar spine showed mild degenerative osteoarthritis of the lumbosacral spine, old compression fractures of T10 and T11 vertebral bodies containing kyphoplasty cement, and an old compression fracture of the T12 vertebral body unchanged compared to the previous film from October 2016. (Tr. 660).

Plaintiff returned to the rheumatologist's office in March 2018 for follow-up of pain in his back and ankle. He had fallen after the kyphoplasty and his pain had returned. He was worse with prolonged walking and standing. He was working 2 to 3 hours per day and was partially able to keep up with household chores. He was going to Sycamore clinic for pain management.[6] On exam, he had a full range

---
[6] There are no records from Sycamore pain clinic in the transcript.

of motion of both shoulders, both elbows, both wrists, both hands, both knees, and both ankles. There was tenderness of the cervical and lumbar spine and paraspinal muscles. He was to continue taking Cymbalta and Meloxicam. He said he felt the same when he returned in June 2018. He said he worked part-time and was partially able to keep up with household chores. He had a full range of motion of both shoulders with tenderness in the left shoulder, full range of motion in both elbows, both wrists, both hands, both knees with tenderness in the right knee, and full range of motion in both ankles. There was tenderness of the cervical and lumbar spine and paraspinal muscles as well as the left foot. The diagnoses were back pain, lumbar; polyarthritis; osteoporosis; and vitamin D deficiency. The assessment was chronic back and joint pain, somewhat improved with Cymbalta and Meloxicam. He was prescribed Fosamax and Zanaflex. (Tr. 594-601).

4. **State Agency Consultants' Opinions**

In September 2016, Dr. Montoya assessed plaintiff's RFC based on a review of the record. He concluded that plaintiff could do medium exertion work limited to frequent climbing of stairs and ramps; occasional climbing of ladders, ropes, and scaffolds; and frequent balancing, stooping, kneeling, crouching, and crawling. (Tr. 83-84).

In January 2017, a second state agency consultant reviewed the updated records and concluded that plaintiff could do light exertion work limited to occasional climbing of stairs and ramps; no climbing of ladders, ropes, and scaffolds; and occasional balancing, stooping, kneeling, crouching, and crawling.

(Tr. 102-103).

## Analysis

Plaintiff first argues that the ALJ ignored relevant evidence and otherwise erred in finding that his subjective complaints were not supported by the record.

SSR 16-3p supersedes the previous SSR on assessing the reliability of a claimant's subjective statements. SSR 16-3p became effective on March 28, 2016 and is applicable here. 2017 WL 5180304, at *1. The new SSR eliminates the use of the term "credibility," and clarifies that symptom evaluation is "not an examination of an individual's character." SSR 16-3p continues to require the ALJ to consider the factors set forth in the applicable regulation, 20 C.F.R. § 404.1529. *Ibid.*, at *10.

The new SSR does not purport to change the standard for evaluating the claimant's allegations regarding his symptoms. Thus, prior Seventh Circuit precedents continue to apply.

The findings of the ALJ as to the accuracy of the plaintiff's allegations are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

Plaintiff first takes issue with the ALJ's statement that plaintiff's allegations were "not entirely consistent" with the other evidence in the record. According to plaintiff, the "not entirely consistent" language indicates that the ALJ applied an incorrect standard. This argument is borderline frivolous. The "not entirely consistent" language is, as plaintiff asserts, boilerplate language that appears in many ALJ decisions. However, the use of boilerplate language is harmless where the ALJ goes on to give his reasons for his decision. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). The use of the phrase "not entirely consistent" does not suggest that the ALJ used an incorrect standard. The ALJ cited the correct standard at Tr. 23 and discussed the relevant factors in assessing plaintiff's allegations.

Plaintiff takes issue with the ALJ's observation that he testified that he lived in an attic apartment from November 2016 through June 2018 and had to climb one flight of stairs to get to the apartment. He faults her for not asking how he navigated that flight of stairs and suggests that "he could have sat on his buttocks and used his arms to navigate upwards and slid off one stair to the next lower stair to navigate down the stairs." Doc. 17, Ex. 1, p. 18. This is rank speculation, unsupported by plaintiff's testimony or anything else in the record. Plaintiff was represented by an attorney at the agency level and is presumed to have put on his best case for benefits. *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007).

Plaintiff also faults the ALJ for stating that he checked in on other residents for the owner in lieu of paying rent. He argues that the ALJ ignored his testimony that he got around on a knee scooter to check in on the other residents. However,

13

this trivial qualification is of little relevance. The fact that plaintiff was able to perform this service for his landlord, thereby earning his rent, provides some support for the conclusion that he was not as incapacitated as he claimed to be.

Plaintiff next argues that the ALJ ignored medical records related to his ankle and his back impairment.

Regarding his ankle, plaintiff argues that the ALJ failed to adequately discuss treatment records between September 2015 and November 2017. This argument ignores the ALJ's discussion of the medical evidence at Tr. 23-26. This argument also conveniently ignores the podiatrist's note from the last visit in November 2017. As the ALJ correctly noted, the podiatrist found that plaintiff was doing extremely well, denied pain, was ambulating in his own shoes, and was active. Further, exam showed full strength and normal range of motion of the left ankle, and the doctor said he had excellent healing and recommended no further treatment.

Plaintiff argues that the ALJ mischaracterized both his thoracic problem, for which he had kyphoplasty, and his lumbar impairment. He asserts, incorrectly, that the ALJ mentioned his kyphoplasty "only in the context of him experiencing increased low back pain subsequent to a fall on stairs in February 2018 and its relationship to an increase in his lumbar pain." Doc. 17, Ex. 1, p. 20. In fact, the ALJ discussed his thoracic problem and kyphoplasty at Tr. 26.

As for his lumbar problem, plaintiff argues that the ALJ grossly mischaracterized his condition by stating that "x-rays and an MRI … 'showed only mild degenerative osteoarthritis,' 'just mild spondylosis,' and 'mild to moderate

14

degenerative changes.'" Doc. 17, Ex. 1, p. 20.  The criticism is misplaced.  The ALJ noted the MRI results at TR. 24, citing to Ex. 3F at 22-23.  That is a citation to the MRI report at Tr. 365-366.  In the bottom-line "Impression" section of the report, the radiologist wrote "Multilevel degenerative disc disease of the lumbar spine as discussed above."  The ALJ also correctly noted that a doctor reviewed his lumbar MRI in April 2016 and agreed that he had neuroforaminal stenosis at L4-5 and sacralization at L5-S1 (Tr. 24), which plaintiff again conveniently ignores. Further, consistent with the ALJ's discussion, later x-rays showed mild degenerative osteoarthritis of the lumbosacral spine.  (Tr. 660).  Plaintiff also points out that straight leg raises were not always normal, but, again, the ALJ so noted.  (Tr. 24, 25).

Plaintiff also complains that the ALJ ignored his joint pain for which he was treated by a rheumatologist.  Again, this complaint is contradicted by the ALJ's discussion of the medical evidence at Tr. 23-26.  It is also contradicted by the quite limited RFC assessment.

None of plaintiff's complaints about the assessment of his allegations holds water.  Significantly, he ignores the other reasons given by the ALJ, including his part-time work.  And, plaintiff denied working at all in 2018, which, as the ALJ noted, was contradicted by the medical records.  (Tr. 26).  The ALJ's conclusion was supported by the evidence and was not "patently wrong;" it must therefore be upheld.  *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

For his second point, plaintiff argues that the ALJ erred by determining for herself the significance of the medical evidence obtained after the review by the

state agency consultants.

Under this point, plaintiff argues that the ALJ gave "significant weight" to both state agency consultants' opinions, but those opinions were different. It is difficult to see how that matters, since, as she specified, the ALJ's assessment was more restrictive than either of the consultants' assessments. See, Tr. 28.

Plaintiff's seems to be arguing that the ALJ erred by crafting her own RFC rather than relying on a medical opinion. This point must be rejected as well. The ALJ "must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions. . . ." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). The determination of RFC is an administrative finding that is reserved to the Commissioner. 20 C.F.R. §404.1527(d)(2).

Citing *Moreno v. Berryhill*, 882 F.3d 722 (7th Cir. 2018), and *Goins v. Colvin*, 764 F.3d 677 (7th Cir. 2014), plaintiff argues that the ALJ erred by "playing doctor." Neither of those cases supports his argument. In *Moreno*, the error was relying on an outdated assessment by a state agency consultant where "later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno*, 882 F.3d at 728. In *Goins*, the error was that the ALJ interpreted for herself the results of an MRI, ignoring the MRI finding of Chiari I malformation and making no effort to compare that MRI with an earlier one. *Goins*, 764 F.3d at 680. Here, the lumbar MRI was done in January 2016, and was part of the record reviewed by the state agency consultants. And, the ALJ did not adopt of the state agency consultants' assessments. The state

agency consultants assessed plaintiff as being capable of medium and light work, while the ALJ found him capable of only a limited range of sedentary work.

Plaintiff's arguments are little more than an invitation for this Court to reweigh the evidence. He has not identified a sufficient reason to overturn the ALJ's conclusion. Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Burmester,* 920 F.3d at 510; *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

## Conclusion

After careful review of the record as a whole, the Court is convinced that the ALJ committed no errors of law, and that her findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE: February 20, 2020.**

**DONALD G. WILKERSON**
**U.S. MAGISTRATE JUDGE**